So Ordered.

Dated: March 31, 2021



Katherine Maloney Perhach
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

In re:                                              Chapter 7
Scott A. Acker and
Amy S. Acker,                                       Case No. 19-21349-kmp
                 Debtors.

---

Timothy J. Andringa et al.,
                 Plaintiffs,

v.                                                  Adv. No. 19-2089

Scott A. Acker et al.,
                 Defendants.

---

**DECISION AND ORDER DISMISSING COMPLAINT**

---

Plaintiffs Timothy and Robin Andringa seek a determination that their former neighbors and friends, Scott and Amy Acker, owe them a nondischargeable debt based on Mr. Acker's involvement in a restaurant offering that occurred approximately ten years before trial. The Andringas seek a $50,000 nondischargeable judgment pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B), and § 523(a)(4), representing the amount of the Andringas' October 2010 investment in a chain restaurant in New Berlin, Wisconsin called Quaker Steak & Lube. The

Andringas allege that the Ackers obtained the $50,000 investment by false representations or a false written statement as outlined in § 523(a)(2)(A) and § 523(a)(2)(B). The Andringas further allege that the Ackers committed "fraud or defalcation while acting in a fiduciary capacity" and embezzlement under § 523(a)(4). The parties have tried the case, and based on the evidence presented at trial, the Court concludes that the Andringas failed to meet their burden to prove by a preponderance of evidence the elements of claims under § 523(a)(2)(A), § 523(a)(2)(B), or § 523(a)(4). Accordingly, and for the reasons stated below, the Court finds in favor of the Defendants, and dismisses the Andringas' adversary complaint.

## Statement of Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and the order of reference from the district court pursuant to 28 U.S.C. § 157(a). See Order of Reference (E.D. Wis. July 10, 1984) (available at www.wied.uscourts.gov/gen-orders/bankruptcy-matters) (last accessed March 30, 2021). As a proceeding to determine the dischargeability of a debt, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and the Court may enter a final judgment. 28 U.S.C. § 157(b)(1).

## Factual Background

In 2010, Sting Ray Hospitality Group LLC ("Sting Ray"), acting by and through Mr. Acker, approached Timothy and Robin Andringa about investing in New Berlin QSL, LLC ("NBQSL") as investors. Mr. and Mrs. Acker and Mr. and Mrs. Andringa were neighbors and friends, as were their sons. NBQSL was organized for the purpose of operating a Quaker Steak & Lube franchise restaurant location in New Berlin, Wisconsin. Ex. 1. p. 9, 11.

NBQSL was formed on May 31, 2010 as a manager-managed limited liability company organized under the laws of the State of Wisconsin and governed by Articles of Organization, an

Operating Agreement, and the Wisconsin Limited Liability Company Act, Chapter 183 of the Wisconsin Statutes. *Id.* p. 4, 11. Mr. Acker was the original member of NBQSL, and was issued 140 units in NBQSL effective May 31, 2010 in exchange for his initial contribution of $2,500 in cash. *Id.* p. 4, 15. On September 5, 2010, Mr. Acker assigned and transferred his 140 units in NBQSL to Sting Ray and on that date Sting Ray became the Manager of NBQSL. *Id.* p. 15, 22, 49, 69. Sting Ray was a management company owned and managed by Mr. Acker and was responsible for the management of the operations of NBQSL and the management of the Quaker Steak & Lube location in New Berlin. Ex. 1 p. 9, 12, 47.

On September 14, 2010, Sting Ray, as the manager of NBQSL, and Mr. Acker sent an Offering Memorandum to the Andringas on behalf of NBQSL. *Id.* p. 1-292. The purpose of the Offering Memorandum was to sell units in NBQSL for an initial price of $1,000 per unit with a minimum purchase of 25 units ($25,000). *Id.* p. 4, 10, 41. Purchasers of the units would become members of NBQSL. *Id.* p. 4. The Offering Memorandum stated that a minimum number of 500 units would be sold for an aggregate subscription amount of $500,000 and that a maximum number of 700 units would be sold for an aggregate subscription amount of $700,000. *Id*. p. 4, 10, 41. NBQSL offered to sell the units for cash and also agreed to accept promissory notes for the purchase of the units, so long as those promissory notes were paid in full by the subscriber with accrued interest no later than ninety days after acceptance by NBQSL. *Id.*

The Offering Memorandum provided that the sale of the units would commence on September 7, 2010, and if subscriptions of $500,000 were not received and accepted by the close of business on October 15, 2010, the offering would be terminated and all subscribers would have their subscription payments returned in full with any interest earned thereon. *Id.* p. 4, 41. The Offering Memorandum stated in pertinent part:

> The minimum number of Units that may be sold in the Offering is equal to five hundred (500) Units at the Subscription Price for an aggregate subscription amount of five hundred thousand and 00/100 dollars ($500,000.00) ("Minimum Offering"). The maximum number of Units that may be sold in the Offering is equal to seven hundred (700) Units at the Subscription Price for an aggregate subscription amount of seven hundred thousand and 00/100 dollars ($700,000.00) ("Maximum Offering"). The Offering will commence on the date of this Private Offering Memorandum. *Notwithstanding the foregoing, if subscriptions for the Minimum Offering have not been received and accepted by on or before the close of business on October 15, 2010 (the "Minimum Offering Date"), the Offering will be terminated and all subscribers will have their subscription payments returned in full with any interest earned thereon.*

Plaintiffs' Ex. 1 at 4, 41 (emphasis added). If NBQSL received and accepted subscriptions of $500,000 by October 15, 2010, then NBQSL would commence operations and Sting Ray would commence use of the proceeds of the offering. *Id.* p. 41.

In addition to the capital contributions made by the members of the LLC, NBQSL intended to borrow $900,000 from Mid America Bank. *Id.*, p. 14, 32. The purpose of the bank loan was to finance the leasehold improvements to the New Berlin property, to purchase equipment and inventory for the restaurant, and to use as working capital for the restaurant. According to the Offering Memorandum, the bank loan was to be for a term of seven years with the initial interest rate expected to be 6%. A security interest in all the assets of NBQSL was offered to the bank as collateral for the loan and Mr. Acker signed a personal guarantee for the loan which was secured by a second mortgage on Mr. Acker's personal residence. The loan required NBQSL to raise a certain amount of equity capital and to refrain from making distributions to its members that would adversely affect the financial condition of NBQSL. The loan was supported by the United States Small Business Administration. *Id.* p. 40.

4

On or about October 5, 2010, the Andringas executed a Subscription Agreement and purchased 50 units in NBQSL for $50,000. Ex. 106B. Mrs. Andringa tendered a check made out to New Berlin QSL, LLC in the amount of $30,000 on October 5, 2010. Ex. 1A, p. 1181. She tendered a second check made out to New Berlin QSL, LLC in the amount of $20,000 on October 6, 2010. Ex. 1A, p. 1180.

The Andringas compiled checks showing that NBQSL had not raised $500,000 by October 15, 2010. Plaintiffs' Ex. 1A. Mr. Acker was not able to produce copies of promissory notes that showed investors had pledged more money to NBQSL or any other documents that demonstrated that he had collected more money. During his testimony, he was unable to say with certainty whether NBQSL had collected $500,000 in checks or promissory notes by the date stated in the Offering Memorandum. Notwithstanding, no capital contributions were returned to the members of the LLC, the bank funded the loan, construction started on the Quaker Steak & Lube location on October 12, 2010, and the restaurant opened in January 2011.

Mr. Andringa testified that the restaurant did "really well" in 2011, 2012, and 2013 and that it did "well" in 2014. NBQSL's balance sheets show that the loan with Mid America Bank was paid down to $701,203.12 by the end of 2012, to $572,203.09 by the end of 2013, and to $436,379.18 by the end of 2014. Ex. 1C, p. 1255, 1257, 1259. According to the Andringas' testimony, they received distributions in 2012, 2013, and 2014 in the total amount of $16,000-$18,000 as a result of their investment in NBQSL.

Mr. Acker confirmed that the New Berlin location had three solid years of business, but began to experience flat or declining sales in 2015. Mr. Acker attributed the declining sales to the financial problems being experienced by the franchisor, Quaker Steak & Lube. Quaker Steak & Lube, the franchisor, went bankrupt in 2015 and was purchased out of bankruptcy by Travel

Centers of America, which saw the future of the franchise in food courts and travel plazas and not free-standing restaurants. Mr. Acker testified that the New Berlin restaurant received little to no support from Travel Centers of America, explaining that the corporate staff went from 44 people to 4 people, there was one field operations person for 60 restaurants, no purchasing department to obtain deals on food for the restaurants, and no marketing support.

After receiving nominal support from the franchisor and attempting to boost sales and cut costs, the Quaker Steak & Lube restaurant in New Berlin conducted its last day of business on March 18, 2018. Ex. 67. The Mid America Bank loan was paid off and NBQSL's lease and its equipment were sold to Point Burger Bar which started operating its own restaurant at the New Berlin location in April 2018.

The Ackers filed for Chapter 7 bankruptcy in 2019. The Andringas filed an adversary proceeding to have their $50,000 investment in NBQSL deemed nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B), or § 523(a)(4), alleging claims of self-dealing, fraud, embezzlement, and intentional misrepresentation.

## Analysis

### I.    The Andringas Bear the Burden of Proof.

The Andringas are objecting to the dischargeability of the $50,000 investment they made in NBQSL in Mr. and Mrs. Acker's bankruptcy case. The Andringas bear the burden of proving by a preponderance of the evidence that an exception to discharge applies. *Grogan v. Garner*, 498 U.S. 279 (1991). It is well-established that exceptions to discharge are construed strictly against a creditor and liberally in favor of the debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000).

## II.   **The Andringas Have Not Proven a Claim Against Mr. Acker Under § 523(a)(2).**

The Andringas rely upon two alleged statements or omissions as the basis for their § 523(a)(2) claim. First, the Andringas allege that their $50,000 investment in NBQSL was obtained by a false representation, namely the statement made in the Offering Memorandum that the Andringas' investment would be returned if NBQSL failed to collect at least $500,000 in subscriptions by the close of business on October 15, 2010. Second, the Andringas allege that Mr. Acker did not disclose to them his negative feelings about the Quaker Steak & Lube franchise and they relied upon his excitement and enthusiasm about the New Berlin location when they invested in NBQSL. However, the Andringas have not clearly articulated whether these alleged statements or omissions are being asserted under § 523(a)(2)(A) or § 523(a)(2)(B). So, as an initial matter, the Court needs to determine whether this alleged representation and this alleged omission falls under § 523(a)(2)(A) or § 523(a)(2)(B).

Section 523(a)(2) of the Bankruptcy Code provides that "[a] discharge under section 727 . . . does not discharge an individual debtor from any debt" –

> (2)    for money, property, services, or an extension, renewal or refinancing of credit to the extent obtained by –
>
> (A)    false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B)    use of a statement in writing —
> (i)    that is materially false;
> (ii)    respecting the debtor's or an insider's financial condition;
> (iii)    on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv)    that the debtor caused to be made or published with intent to deceive.

7

Subsections 523(a)(2)(A) and (B) are

> two close statutory companions barring discharge. One applies
> expressly when the debt follows a transfer of value or extension of
> credit induced by falsity or fraud (not going to financial condition),
> the other when the debt follows a transfer or extension induced by
> a materially false and intentionally deceptive written statement of
> financial condition upon which the creditor reasonably relied.

*Field v. Mans*, 516 U.S. 59, 66 (1995). In other words, whether subsection 523(a)(2)(A) or

subsection 523(a)(2)(B) applies depends on whether the alleged fraud or falsity is "respecting the

debtor's or an insider's financial condition." If the alleged representations and omissions made

in this case are not statements respecting the debtor's or an insider's financial condition, then the

claims fall under § 523(a)(2)(A). If the alleged representations and omissions made in this case

are respecting the debtor's or an insider's financial condition, then the claims fall under

§ 523(a)(2)(B) and the alleged false representation must be in writing to be nondischargeable.

A statement is "respecting a debtor's financial condition" if "it has a direct relation to or

impact on the debtor's overall financial status." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.

Ct. 1752, 1761 (2018). In *Appling*, the debtor owed a law firm $60,000 and stated he was

expecting a $100,000 tax refund. In reliance on the statement, the firm continued to represent

the debtor without collecting the overdue amount. The Supreme Court held that the debtor's

statement constituted a statement "respecting" his financial condition, noting that "[a] single

asset has a direct relation to and impact on aggregate financial condition, so a statement about a

single asset bears on a debtor's overall financial condition and can help indicate whether a debtor

is solvent or insolvent, able to repay a given debt or not." *Id.* If the debtor makes a false

statement respecting the financial condition of an "insider" (i.e. a corporation of which the debtor

is a director, officer or person in control), then the alleged false representation must also be in

writing to be nondischargeable. *See* 11 U.S.C. § 101(31) and § 523(a)(2)(B).

Here, the statement in the Offering Memorandum that NBQSL would raise $500,000 or the offering would be terminated is not a statement respecting the Debtors' (i.e. the Ackers') financial condition, but it is a statement "respecting . . . an insider's financial condition," namely NBQSL. NBQSL is a limited liability company of which Mr. Acker is a director, officer or person in control; therefore, NBQSL is an "insider" as defined in 11 U.S.C. § 101(31). Ex. 1, p. 12, 22-23, 47, 73-74, 90. Like the statement in *Appling*, a suggestion that NBQSL would have at least $500,000 in capital contributions in addition to a $900,000 loan from Mid America Bank has a direct relation to or impact on NBQSL's overall financial and solvency status. The capital contributions and the loan were intended to cover the start-up expenses for the New Berlin restaurant, including the leasehold improvements, furniture, fixtures, equipment, décor, smallwares, pre-opening costs, recruitment and management development, licenses, permits, franchise fee, legal fees and expenses related to the offering, and working capital. Ex. 1, p. 44. The statement in the Offering Memorandum that the Andringas' investment would be returned if NBQSL failed to collect subscriptions of $500,000 was therefore a statement "respecting an insider's financial condition." As a result, this alleged false representation, which is in writing in the Offering Memorandum, falls under § 523(a)(2)(B).

The Andringas' second basis for their § 523(a)(2) claim, that Mr. Acker did not disclose to them his negative feelings about the Quaker Steak & Lube franchise, is not a statement "respecting the debtor's or an insider's financial condition." Therefore, this aspect of the Andringas' § 523(a)(2) claim falls under § 523(a)(2)(A).

A. **The Andringas Have Not Met Their Burden of Proving by a Preponderance of the Evidence That Their $50,000 Investment in NBQSL Is Nondischargeable Under § 523(a)(2)(B).**

Section 523(a)(2)(B) requires the creditor to prove that the debt was obtained by use of a statement in writing respecting the debtor's or an insider's financial condition: (1) that is

materially false; (2) on which the creditor reasonably relied; and (3) that the debtor caused to be made or published with the intent to deceive.  11 U.S.C. § 523(a)(2)(B).  When a debtor "knowingly or recklessly makes a false representation which the person knows or should know will induce another to make a loan, intent to deceive may be logically inferred."  *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995) (quoting *In re Garman*, 643 F.2d 1252, 1260-61 (7th Cir. 1980)).  "Among the factors to be considered are 'whether the debtor was intelligent and experienced in financial matters, and whether there was a clear pattern of purposeful conduct.'" *Colchester State Bank v. Phillips (In re Phillips)*, 367 B.R. 637, 644 (Bankr. C.D. Ill. 2007) (quoting *In re McCleary*, 284 B.R. 876 (Bankr. N.D. Iowa 2002)).  The Andringas have failed to establish by a preponderance of the evidence that Mr. Acker circulated the Operating Memorandum with the "intent to deceive" that § 523(a)(2)(B) requires.

The evidence offered at trial showed that Mr. Acker was not a particularly sophisticated businessman or experienced in financial matters like those presented in the Offering Memorandum.  From a higher education standpoint, Mr. Acker received an Associate Degree in Hospitality Management from Waukesha County Technical College.  He had experience working as a cook at several restaurants, as a manager and then owner of several Steak Escape franchises, and as a supervisory manager and partial owner of Quaker Steak & Lube restaurants in Middleton and Madison, Wisconsin.  He described himself as the "operations person."  This included being involved in the day-to-day operations of the restaurants – hiring management personnel, making sure the restaurants were adequately staffed and the staff was trained, selecting menu items and product suppliers, and preparing marketing plans and selecting marketing strategies for the restaurant.

The evidence offered at trial further showed that Mr. Acker had never been involved with an Offering Memorandum before the Offering Memorandum for NBQSL, even though he had opened two other Quaker Steak & Lube restaurants before opening the New Berlin location. He commented that one of the investors, not the Andringas, requested an "official document" and how NBQSL hired Attorney Bill Kutsunis to put together the Offering Memorandum and the other documents. He described his previous experience of opening new restaurants as "just a bunch of guys just investing in a restaurant, putting their money in."

Mr. Acker demonstrated a lack of sophistication when it came to the Offering Memorandum and an incomplete understanding of the Offering Memorandum, in particular the statement in the Offering Memorandum that if subscriptions of $500,000 were not received and accepted by the close of business on October 15, 2010, the offering would be terminated and all subscribers would have their subscription payments returned in full with any interest earned thereon. He testified that he believed the $500,000 number was inserted as a placeholder to put together the Small Business Administration loan with Mid America Bank. From his perspective, the bank just needed to know that he had the right amount of capital contributions to support the SBA loan, which is typically 20% of the total project. The Bank was clearly satisfied because it made the loan to support the start-up expenses of the restaurant and there was sufficient money to support those expenses because the restaurant started construction on October 12, 2010, and opened successfully in January 2011.

Mr. Acker credibly testified that he was not aware of that portion of the Offering Memorandum that required NBQSL to return funds if the $500,000 threshold was not met. Mr. Acker did not know why the October 15, 2010 date was included in the Offering Memorandum. He had traditionally relied on business partners and friends, like the Andringas, to provide the

funds constituting their investments or to pay on any promissory notes that they offered to support their investment as they were able to do so. Based upon his previous experience, he thought people were "in," their intentions were legitimate, and he did not think anyone was going to back out. He did not believe NBQSL had any obligation to give any money back, especially since construction started on October 12, 2010.

The evidence further showed that the Andringas knew in January 2011, after the October 15, 2010 date came and went, and after construction of the restaurant was well under way, that NBQSL was still waiting for some investors' money. Mr. Acker disclosed to Mr. Andringa in an email dated January 18, 2011:

> I am still waiting on two investors money. One gets his when the first rent is paid (the broker) and the other is the contractor who gets his on the last bank draw. No additional investors will be necessary nor will we need any more money.

Ex. 34. Mr. Andringa expressed no worry about the October 15, 2010 deadline not being met, but instead worried that additional investors would be added that would dilute his ownership share of NBQSL. *Id.*

The evidence further demonstrated that the Andringas knew in June 2011 that some of the investors in the New Berlin restaurant had not contributed cash for their equity positions in NBQSL but had instead given notes payable. Mr. Acker explained:

> Bob just bought his deli and Mark is building his new house so they could not put in but signed the loan and own the rights for the Franchise for Wisconsin and Steve's company would not let him invest his whole comission [sic] as he wanted. I will deiced [sic] soon weather [sic] to keep the shares as is and use distributions to pay off the shares or delute [sic] shares I have to talk to each of them and attorney Bill K to see what to do.

Ex. 35. The Offering Memorandum explicitly provided that NBQSL could allow certain subscribers to provide promissory notes at the time of their subscription for units instead of

delivering cash or other payments made in immediately available funds. Ex. 1, p. 2, 21. Mr. Acker's inability to produce signed promissory notes and his concession that he did not know whether or not some of the investors signed notes further demonstrated his lack of sophistication when it came to this transaction. This evidence also demonstrated that Mr. Acker was not trying to hide anything from the Andringas.

The Andringas did not prove by a preponderance of the evidence that Mr. Acker had an "intent to deceive" them with the statement made in the Offering Memorandum that the Andringas' investment would be returned if NBQSL failed to collect at least $500,000 in subscriptions by the close of business on October 15, 2010. Mr. Acker was not a particularly sophisticated businessman or experienced in financial matters like those presented in the Offering Memorandum. He relied upon an attorney to prepare the required documents for the offering. He had never been involved with an Offering Memorandum before NBQSL's Offering Memorandum. He demonstrated a lack of sophistication when it came to the Offering Memorandum and an incomplete understanding of the Offering Memorandum. Far from establishing a pattern of purposeful conduct indicating that Mr. Acker knowingly or recklessly made a false representation or possessed an intent to deceive the Andringas when he presented them with the Offering Memorandum and collected their investment, Mr. Acker's testimony showed that he put together the business deal as he had put together deals in the past, relying on business partners and friends like the Andringas to provide the funds constituting their investment as they were able to do so. The capital contributions made were sufficient to obtain the loan from Mid America Bank, sufficient to fund the start-up costs of the restaurant, and sufficient to open the restaurant in January 2011. Mr. Acker did not engage in a clear pattern of

13

purposeful conduct designed to deceive the Andringas. There was no intent on the part of Mr. Acker to deceive the Andringas.

**B.** **The Andringas Have Not Met Their Burden of Proving by a Preponderance of the Evidence that their $50,000 Investment in NBQSL Is Nondischargeable Under § 523(a)(2)(A).**

The Andringas alleged as a second basis for denying the Ackers their discharge under § 523(a)(2) that Mr. Acker did not disclose to them his negative feelings about the Quaker Steak & Lube franchise when seeking their $50,000 investment in NBQSL. This claim is based on an email exchange between Mr. Acker and John Longstreet, the President and Chief Executive Officer of the national franchisor, Quaker Steak & Lube, on November 18, 2010 and November 22, 2010. Ex. 32-33. On November 18, 2010, Mr. Longstreet sent an email to Mr. Acker about treating Quaker Steak & Lube team members respectfully and noted that Mr. Acker had "developed a reputation as one who at times is abusive to Quaker Steak & Lube Team Members." Ex. 32. Mr. Acker gave the email some thought over the weekend, and responded as follows:

> As promised I will give you a brief answer and some day over a good stiff drink I will give you the rest of the trash.
>
> To keep it short QSL has over the years been a personal disaster. I have committed my self [sic] 120 % and paid steep price to be the owner made no money yet lost a ton and to that end the staff at support has always let me down. I have so many stories for you and I do not have time to go over. I feel like most times they are at 80 %. Now I am into the third restaurant largely because I think that with you in charge things will change and now that you have had some time on the saddle not much again has from 500 miles . At first they got nicer but getting projects and progress done has not happened. We have been working on this for over nine- twelve months and the in my opinion over paid, under worked over vacationed staff ( a huge issue to a guy that makes less personal income than a general manager gets no vacation time and never gets the "nice" weekend and that's a huge mental mountain I have to battle with every day ) That they would put there [sic] heels in

the mud over this menu drive throughissue [sic] and really does not get what should have been done months ago and really the entire staff involvement this late in the game is just to [sic] much to take. Jaime and you and Jig all had knowledge of this months ago now its [sic] a problem?? No construction department with all this expansion huge problem. These construction/ openings are very difficult to get done. the 5th quarter quarterbacking on what we should have done in Madison is also very difficult to deal with. Gary visit was productive but now what? We have no money to fix the problems so I again have to try to figure it out. It can not [sic] always be Scott problem. If you feel it is then I should resign.

ALL very difficult to explain but I just a regular guy with very little money trying to get this current project finished.

Maybe someday I will not be broke extended so far now I cannot see the end and I will work on the mental mountain but your staff is not as nice as you would think they bruise at the slightest criticism of QSL. If I was the bully/ jerk your staff makes me out to be would I have the second longest tenured mangement [sic] team in the sytem [sic]? I can and have worked with my staff and I believe they do like working for me. I work hard they work hard. The lack of work by Lube support team is difficult for even my team to deal with. Trying to make us all happy may be impossible.

The progress is so slow as not to be noticed from Wisconsin. The menu and purchasing, the horribly lead opening and the lack of real support on visits. I do not need the pat on the head I need to make money and get my share holders there [sic] investment. I am 42 and have a very short window to get this done.

To say the least the pressure is really on and your staff is oblivious to what it takes to own and operate a business. Only a couple of people Gary Jig you and John V get it. Hard to deal with when you are paying soon nearly 500K a year for assisantance [sic]. I really only want the best for the system, my employees and my shareholders

Thanks for putting me in the conrer [sic] I needed a time out. I will be more civil the rest of the project.

Ex. 33. The Andringas assert that if they had known that Mr. Acker felt that Quaker Steak & Lube "had over the years been a personal disaster," they never would have invested in NBQSL.

As mentioned above, this omission is not a statement "respecting the debtor's or an insider's financial condition," so this aspect of the Andringas' § 523(a)(2) claim falls under § 523(a)(2)(A).  Section 523(a)(2)(A) requires the creditor to prove by a preponderance of the evidence that:  (1) the debtor made a false representation or omission, which the debtor either knew was false or made with reckless disregard for the truth; (2) the debtor possessed an intent to deceive or defraud; and (3) the creditor justifiably relied on the false representation.  11 U.S.C. § 523(a)(2)(A); *Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011); *see also Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010).  "[O]missions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor."  *Holton v. Zaidel (In re Zaidel)*, 553 B.R. 655, 663 (Bankr. E.D. Wis. 2016) (citing *Memorial Hosp. v. Sarama*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996)).  "A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and the debtor's omission was motivated by an intent to deceive."  *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 n.4 (9th Cir. 2001) (citing *Citibank (South Dakota), N.A. v. Eashai*, 87 F.3d 1082, 1089-90 (9th Cir. 1996)).  Proof of intent to deceive or defraud is "measured by a debtor's subjective intention at the time of the transaction in which the debtor obtained the money, property or services."  *Mega Marts, Inc. v. Trevisan (In re Trevisan)*, 300 B.R. 708, 717 (Bankr. E.D. Wis. 2003).

The first problem with the Andringas' omission claim is that proof of intent to deceive or defraud is "measured by a debtor's subjective intention at the time of the transaction in which the debtor obtained the money, property or services."  *Trevisan*, 300 B.R. at 717.  The Andringas made their investment on October 5, 2010.  Mr. Acker sent the email in which he referred to

Quaker Steak & Lube as a "personal disaster" on November 22, 2010. There was no evidence presented at trial that Mr. Acker had these same feelings at the time he obtained the Andringas' investment in NBQSL on October 5, 2010. Consequently, the Andringas have not proven Mr. Acker had an intent to deceive or defraud them at the time he obtained the Andringas' $50,000 investment in NBQSL.

The most fundamental problem with the Andringas' omission claim is that they did not prove by a preponderance of the evidence that Mr. Acker's alleged omission was motivated by an intent to deceive the Andringas. In the email, Mr. Acker expressed displeasure with how much he was working, how he was making less money as an owner than a general manager would, and he bemoaned his lack of vacation and long weekends. He also expressed his feelings about his perceived lack of support from the national team at Quaker Steak & Lube. There was no evidence presented at trial that by not disclosing his hard feelings about how much he was working and how little he was earning that he intended to deceive the Andringas. He remained excited and enthusiastic about opening the New Berlin restaurant and its location. And the New Berlin restaurant was a success for four years. As Mr. Andringa testified, the New Berlin restaurant did "really well" in 2011, 2012, and 2013 and it did "well" in 2014. So well, in fact, the Andringas received distributions in 2012, 2013, and 2014 in the total amount of $16,000-$18,000 as a result of their investment in NBQSL. The Andringas failed to prove at trial that Mr. Acker had the requisite intent to deceive them by not sharing with them the feelings he expressed to the national franchisor.

"Actual fraud" can also form the basis for excepting a debt from discharge under § 523(a)(2)(A). *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1590 (2016); *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000). Actual fraud includes "any deceit, artifice, trick, or

design involving direct and active operation of the mind, used to circumvent and cheat another."
*McClellan*, 217 F.3d at 893 (citation omitted). The evidence presented at trial also does not support a finding that Mr. Acker committed "actual fraud" when he did not disclose whatever negative feelings he might have been having about the national Quaker Steak & Lube franchise to the Andringas. The Andringas did not prove by a preponderance of the evidence that Mr. Acker used any deceit, artifice, trick, or design involving direct and active operation of the mind to circumvent and cheat them.

**C.    The Andringas Did Not Meet Their Burden of Proving That Their $50,000 Investment in NBQSL Was "Obtained by" False Representations or Materially False Statements.**

Both § 523(a)(2)(A) and § 523(a)(2)(B) claims require the debt to have been "obtained by" false representations or materially false statements for the debt to be deemed nondischargeable. The debt at issue in this case is the $50,000 investment that the Andringas made in NBQSL in October 2010. Therefore, that $50,000 debt must have been "obtained by" false representations and materially false statements made before the Andringas' invested $50,000 in October 2010. The Andringas have asserted the following additional alleged false statements were made to them:

(1)    In March 2014, Mr. Acker sent a text message to Mrs. Andringa, stating that NBQSL would have its loan paid off in three years (i.e. by March 2017). Ex. 46.

(2)    In 2012, NBQSL issued a K-1 to its investors for tax year 2011 showing a $600,000 capital account balance at the beginning of the year. Ex. 40.

The $50,000 debt at issue in this case was not "obtained by" either of these alleged representations. The text message exchange was four years <u>after</u> the Andringas made their investment in NBQSL. The K-1 was issued a year <u>after</u> the Andringas made their investment in

18

NBQSL. The Andringas' $50,000 investment was not "obtained by" the text message exchange or the K-1; therefore, these alleged representations do not support claims under § 523(a)(2).

**III.**   **The Andringas Have Not Proven a Claim Against Mr. Acker Under § 523(a)(4).**

The Andringas also seek to have their $50,000 investment in NBQSL deemed nondischargeable under 11 U.S.C. § 523(a)(4). Section 523(a)(4) of the Bankruptcy Code provides that:

> A discharge under section 727 . . . does not discharge an individual debtor from any debt – for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

The Andringas rely upon four main allegations to support their § 523(a)(4) claim for "embezzlement" or "fraud or defalcation while acting in a fiduciary capacity." First, they rely on the same factual allegations that form the basis for their § 523(a)(2) claim, namely that Mr. Acker committed fraud or defalcation while acting in a fiduciary capacity based upon the statement in the Offering Memorandum that the Andringas' investment would be returned if NBQSL failed to collect at least $500,000 in subscriptions by the close of business on October 15, 2010. Second, they assert that Mr. Acker moved resources between the New Berlin Quaker Steak & Lube restaurant and the other Quaker Steak & Lube restaurants located in Middleton, Madison, and Janesville to the detriment of NBQSL. Third, the Andringas assert that Mr. Acker regularly gave away food to create goodwill for himself as opposed to NBQSL. Finally, they assert that Mr. Acker engaged in self-dealing when the New Berlin Quaker Steak & Lube restaurant was failing by obtaining an ownership interest in the restaurant that ultimately took over its location, Point Burger Bar, and not offering that same deal to the Andringas. For the reasons stated below, the Andringas have failed to establish by a preponderance of the evidence

that Mr. Acker committed fraud or defalcation while acting in a fiduciary capacity or that he embezzled any funds based on any of these factual allegations.

There are two main questions that need to be answered in determining whether a debt is nondischargeable under § 523(a)(4) due to fraud or defalcation by a fiduciary: (1) was the debtor acting in a fiduciary capacity when the debt was created; and (2) did the debtor commit fraud or defalcation. In the context of § 523(a)(4), fraud or defalcation means "'positive fraud in fact, involving moral turpitude or intentional wrong . . . and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality.'" *Milwaukee Builders Supply, Inc. v. St. Antoine (In re St. Antoine)*, 533 B.R. 743, 748 (Bankr. E.D. Wis. 2015) (quoting *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273 (2013)). The Supreme Court included "not only conduct that the fiduciary knows is improper, but also reckless conduct of the kind set forth in the Model Penal Code." *Id.* Defalcation "requires proof of 'a culpable state of mind . . . involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior.'" *Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016) (quoting *Bullock*, 569 U.S. at 269). "Defalcation" as used in § 523(a)(4) need not involve bad faith, but its "state-of-mind requirement requires at least a subjective, *criminal* level of recklessness." *Id.* at 925; *see Bullock*, 569 U.S. 267.

"Embezzlement" is an additional ground for denying a debtor a discharge under § 523(a)(4). Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989). Embezzlement need not be committed by a fiduciary. However, the objecting party must prove by a preponderance of the evidence that the debtor acted with fraudulent intent or deceit. *Id.*

For the purpose of this decision, the Court does not need to answer the question of whether Mr. Acker was acting as a fiduciary because the Andringas did not prove by a preponderance of the evidence that Mr. Acker acted knowingly or with gross criminal recklessness related to the Offering Memorandum, the sharing of resources between the four Quaker Steak & Lube restaurants, the donations of food NBQSL made in the community, or the Point Burger Bar. Additionally, and as noted throughout this opinion, Mr. Acker did not act with fraudulent intent or deceit that would support a finding that he embezzled any funds either.

The first basis for the Andringas' § 523(a)(4) claim for embezzlement, fraud, or defalcation against Mr. Acker, for not causing NBQSL to return the Andringas' $50,000 investment when NBQSL failed to collect $500,000 in subscriptions by October 15, 2010, as stated in the Offering Memorandum, fails for similar reasons that the Andringas' § 523(a)(2)(B) claim failed. As noted *supra*, Mr. Acker lacked the requisite "intent to deceive" required for the § 523(a)(2)(B) claim. For the same reasons, Mr. Acker failed to act with the requisite "fraudulent intent or deceit" to support an embezzlement claim and the evidence does not support a finding that Mr. Acker acted knowingly or with gross criminal recklessness related to the Offering Memorandum.

NBQSL used the Andringas' $50,000 investment and the other subscribers' investments, along with the loan from Mid America Bank, to start up the New Berlin Quaker Steak & Lube restaurant, as stated in the Offering Memorandum. Mrs. Andringa testified that she understood that her investment would be used to start up the restaurant. There was no evidence presented that Mr. Acker used the Andringas' investment for personal purposes or otherwise absconded with any of the money. As a restaurant manager, Mr. Acker was unsophisticated when it came to the Offering Memorandum. He had never been part of an Offering Memorandum before, noting

that NBQSL relied on an attorney to draft the necessary paperwork. His testimony was credible when he stated that he did not know the significance of the October 15, 2010 date in the Offering Memorandum. He thought the New Berlin restaurant would open in the same way the other locations had opened: his business partners and friends would contribute their investments, the bank would make the loan when it was satisfied that there were enough capital contributions, construction would commence, and the restaurant would open. Based upon his previous experience, he thought people were "in," their intentions were legitimate, and he did not think anyone was going to back out. The Andringas' and the other investors' capital contributions were sufficient to obtain the loan from Mid America Bank, sufficient to pay the start-up costs for the restaurant, and sufficient to successfully open the restaurant in January 2011. By Mr. Andringa's own testimony, the restaurant did "really well" in 2011, 2012, and 2013 and it did "well" in 2014. The evidence presented at trial did not show that Mr. Acker acted in bad faith, immorally, with moral turpitude, or in a grossly criminal reckless manner related to the Offering Memorandum. Mr. Acker did not engage in a clear pattern of purposeful conduct designed to deceive the Andringas.

The second basis for the Andringas' § 523(a)(4) claim for embezzlement, fraud, or defalcation against Mr. Acker was that Mr. Acker moved resources between the New Berlin Quaker Steak & Lube restaurant and the other Quaker Steak & Lube restaurants located in Middleton, Madison, and Janesville to the detriment of NBQSL. The Andringas asserted that the commingling of assets between NBQSL, the company in which they had an ownership interest, and the other Quaker Steak & Lube restaurants, in which they had no ownership interest, constituted a breach of fiduciary duty for which Mr. Acker should be liable under § 523(a)(4).

22

Mr. Acker testified that food was shared between restaurants, as were marketing materials. If one restaurant ran out of pretzels, for example, he would bring some from another restaurant, and that restaurant would later order more pretzels to return. He characterized this as inevitable in order to maintain the amount of product necessary to support the sales of each restaurant; if one restaurant was shorted wing sauce by a vendor, he would have to bring sauce over to that restaurant. Additionally, the restaurants shared a marketing person and a maintenance person. This was because none of the restaurants could support a full-time employee, and each restaurant paid its share of the employee's time. None of this benefitted Mr. Acker personally. As he stated, "it was just an efficient way to try to keep costs down in all three restaurants." There was some evidence that the locations were swapping cash, even though the investors in the restaurants were different, but Mr. Acker was adamant that Jason Kadow, the restaurants' accountant, was keeping track of this and it was expressed in the profit and loss statements. Ex. 1E. There was additionally some evidence that $10,000 was borrowed from the New Berlin restaurant to pay earnest money for the Janesville Quaker Steak & Lube; however, Mr. Acker testified that the loan was paid back. Ex. 43.

Mr. Kadow managed the finances for the restaurants. His testimony agreed with Mr. Acker's testimony. One invoice would come from a vendor for all three restaurants and would be split. Sometimes product would be inadvertently dropped off at one location, or a location would run out of a certain product. There was some commingling of products, staff, and costs, but not of money. Mr. Kadow admitted that this was an "accounting nightmare."

None of this conduct shows that Mr. Acker was guilty of embezzlement or fraud or defalcation. Mr. Acker's conduct does not rise to the level of fraudulent intent, intentional conduct, or gross criminal recklessness. Equally important, there was no quantification of

damages, if any, presented at trial related to the alleged commingling of resources between the restaurants. Mr. Andringa testified and admitted in his oral summation that he could not figure out the dollar amount in which the Andringas were damaged by Mr. Acker's claimed breach of fiduciary duty, alleging it would require an expensive audit to determine this. Instead, he asked the Court to disgorge the entire $50,000 investment to compensate the Andringas. Even if Mr. Acker could somehow be guilty of embezzlement, fraud, or defalcation under this fact pattern, with no proof of damages, the Court is unable to make any such award to the Andringas.

As their third basis for their fraud, defalcation or embezzlement claim under § 523(a)(4), the Andringas asserted that Mr. Acker constantly gave away food to friends and family to create goodwill for himself as opposed to NBQSL. The Andringas complained that Fisher House, a home away from home for veterans and military families who need temporary care while their loved ones receive care at the VA Medical Center, received the profits from Bike Night sales in 2017 instead of the members of NBQSL. Ex. 87. The Andringas further complained that on one occasion, Mr. Acker delivered third shift turkey dinners to the New Berlin Police Department, and on another occasion, he donated 20% of food sales on a Monday night to his son's school. Ex. 88, 91. The Court can easily dispose of this claim. Promotional activity like this is part of managing and running a restaurant. None of these actions support a claim for embezzlement or fraud or defalcation under § 523(a)(4).

As their fourth and final basis for their fraud, defalcation or embezzlement claim under § 523(a)(4), the Andringas asserted that Mr. Acker engaged in self-dealing when the New Berlin Quaker Steak & Lube restaurant was failing by obtaining an ownership interest in the restaurant that ultimately took over its location, Point Burger Bar, and not offering that same deal to the

Andringas.  The trouble with this allegation is that the evidence at trial showed that it never

happened.  Mr. Acker never obtained an ownership interest in the Point Burger Bar.

In an attempt to demonstrate that Mr. Acker was engaged in self-dealing by trying to

obtain an interest in Point Burger Bar, Mr. Andringa placed significance on a document titled

"PBB New Berlin LLC Operating Agreement."  Ex. 80.  The document stated that the purpose of

the LLC was to "operate a business as 'Point Burger Bar.'"  It was signed by Scott Acker on

behalf of New Berlin Burgers LLC and Brian Ward on behalf of New Berlin Investments I, LLC.

New Berlin Burgers (Mr. Acker and Jason Kadow) was to own 30% and New Berlin Investments

I (Brian Ward and Jon Ferraro) were to own 70%.  Mr. Acker stated that "very early discussions"

involved him obtaining an ownership interest in Point Burger Bar, but that it did not come to

fruition.  He was hoping to move the NBQSL investors into a different brand because he felt

Quaker Steak & Lube was a "sinking ship."  The negotiations were a "hail Mary" that involved

flipping the restaurant and getting something, as opposed to closing it and getting nothing.  Mr.

Acker testified that it was his intent to involve all of the NBQSL partners in the deal, if they had

received an ownership interest in Point Burger Bar.

Mr. Kadow reviewed a draft term sheet indicating that the New Berlin restaurant was

going to become Point Burger Bar and confirmed that at one point he was supposed to obtain an

ownership interest in Point Burger Bar, but never did.  Ex. 61.  He confirmed that subsequent

documents nullified the PBB New Berlin LLC Operating Agreement and the deal never

happened.  He never had an ownership interest in Point Burger Bar.  Mr. Kadow was not aware

whether Mr. Acker had spoken with the other NBQSL investors about the transition, but he

confirmed that it was his understanding that the deal, had it gone through, was going to involve

all of the other NBQSL investors.  The Andringas' allegations concerning the Point Burger Bar

were unsupported by the evidence presented at trial; therefore, their fraud, defalcation, or embezzlement claim fails for this additional reason.

**IV.**     **The Court Dismisses the Claims Against Mrs. Acker.**

The Court can easily dispose of the question of whether the Andringas are entitled to judgment against Mrs. Acker. The Andringas presented no evidence that Mrs. Acker was involved in the NBQSL offering, made any representations to the Andringas, or was involved in any way in the management of the restaurant business. In fact, Mr. Andringa testified that Mrs. Acker did not affirmatively make any statements to him, he did not discuss the matter with her, and he did not know her involvement with regard to the offering. Mrs. Acker did not testify at trial and Mr. Acker did not describe any involvement by her. There is no basis for the Court to conclude that Mrs. Acker was involved in making a false statement, in writing or otherwise, or that she committed fraud or defalcation in a fiduciary capacity or embezzlement. Accordingly, any debt owed to the Andringas is dischargeable as to Mrs. Acker and the claims against her are dismissed.

<u>Conclusion</u>

In the end, the Andringas made an investment that did not turn out as they hoped. They invested in a restaurant that did well for four years but ultimately failed. The Andringas lost their investment because the restaurant failed, not because of any fraud. The Andringas did not meet their burden of proving by a preponderance of the evidence that their $50,000 investment in NBQSL is nondischargeable in Mr. and Mrs. Acker's bankruptcy case under § 523(a)(2)(A), § 523(a)(2)(B), or § 523(a)(4). Accordingly,

IT IS THEREFORE ORDERED:  the Complaint is dismissed.

#####